IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF POLLY G. & SAWYER G.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF POLLY G. & SAWYER G., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

CONSTANCE G., APPELLANT.


Filed August 15, 2023.   Nos. A-22-948, A-22-949.


Appeals from the County Court for Valley County: KALE B. BURDICK, Judge. Affirmed.

Michael S. Borders, of Borders Law Office, for appellant.

Heather L. Sikyta, Valley County Special Prosecutor, for appellee.

Andrew Hanquist, of Central Nebraska Attorneys, P.C., L.L.O., guardian ad litem.


PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

MOORE, Judge.

## I. INTRODUCTION

Constance G. appeals from an order of the Valley County Court sitting as a juvenile court, terminating her parental rights to two of her children. Upon our de novo review of the record, we affirm.

## II. STATEMENT OF FACTS

Constance is the biological mother of Polly G., born in July 2010; and Sawyer G., born in June 2016. Constance is also the mother of two other children, who are not at issue in this case. Polly and Sawyer share the same biological father, Clinton G. As discussed further below,

- 1 -

Clinton's parental rights to Polly and Sawyer were terminated during these same proceedings, and we only discuss him as necessary to the resolution of the current appeal by Constance.

## 1. PROCEDURAL BACKGROUND

The children were removed from the home by law enforcement on January 17, 2021, following a report of domestic violence. Separate petitions were filed later that day to adjudicate Polly and Sawyer pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) based on Constance and Clinton becoming involved in physical domestic violence while the children were in the home, placing them at risk of harm. The children were adjudicated in April 2021. They have remained out of the home since they were removed.

The juvenile court entered a dispositional order on August 11, 2021, adopting the case plan presented by the Nebraska Department of Health and Human Services (the Department). Constance's case plan goals included maintaining a healthy relationship with Clinton; providing for the children's safety and wellbeing in a safe environment free from illegal substances; and ensuring that the children attend school and all appointments. Review hearings were held on November 10, 2021; January 26, 2022; and June 30. The goals of the court adopted plans have been consistent throughout the case.

Upon the children's removal they were placed into the home of their paternal grandmother, Karen G., in Arcadia, Nebraska. On December 10, 2021, the Department filed a notice of placement change, stating that Polly and Sawyer had been placed in an agency supported foster home in Lynch, Nebraska; approximately 140 miles away from Arcadia. That same day, Constance filed an objection to the change of placement, arguing that the Department "set the parents up for failure by removing the children so far away so that the parents cannot participate and visit with their children." Also on December 10, Constance filed a motion to stay the placement change until a hearing could be held on the matter.

A hearing on the change of placement was held on December 22, 2021. Karen testified that she was no longer able to care for Polly and Sawyer due to her age, health conditions, and challenges with discipline. She stated, "I don't really want to let them go, but my age, their age, is not conducive to a good lifestyle."

Karen also testified that "an adoptive issue" had been directed at Constance and Clinton by the Department "since the first day they were in Court. . ." The juvenile court reassured Karen that the parents "have an opportunity to rectify the situation and get their children back."

Karen went on to express that the family's current Department caseworker, Gage Crowell, had been "our worst nightmare." Karen described a general lack of communication, a delay in setting up therapeutic services for the children, and multiple instances where parenting time was canceled with short notice because no visitation workers were available to supervise, which caused distress to the children. The court took the placement change under advisement.

In an order filed on December 22, 2021, the juvenile court found that the change of placement proposed by the Department was in the best interests of Polly and Sawyer and should proceed as outlined by the Department's December 10 notice.

On January 11, 2022, Constance filed a motion for increased visitation, alleging that the Department had significantly reduced her parenting time with the children by only offering visitation every other weekend. Constance argued that increased visitation needed to occur to

maintain a positive parent-child relationship. On January 21, Constance filed an objection to the Department's January 11 case plan alleging that the Department had failed to investigate placement options which were a reasonable distance from the family home in Arcadia, and that the placement of the children 140 miles away had disrupted the children's therapeutic services and visitation with the parents. Also on January 21, Constance filed a motion to replace the case manager, presumably Crowell, though the motion does not name the case manager. Constance alleged that the relationship between Constance and the case manager had "degenerated to the point the relationship is detrimental to achieving the goal of reunification" and that the continued involvement of the current case manager was not in the best interests of the children.

On April 8, 2022, the Department filed another notice of placement change, informing the juvenile court that Polly and Sawyer would be moved to an agency supported foster home in O'Neill, Nebraska, approximately 100 miles away from Arcadia. On April 11, Constance filed an objection to the change of placement, alleging that the Department had not fully explored placement closer to the family home; that the proposed placement interferes with reasonable efforts to reunify the family; and that the placement was not in the best interests of the children.

On April 22, 2022, the guardian ad litem (GAL) and the State filed a joint motion for termination of Constance's and Clinton's rights regarding the two children, alleging statutory grounds to terminate the parents' rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016), and alleging that termination was in the best interests of the children.

On May 13, 2022, Constance filed another motion to replace the Department caseworker, this time naming Crowell. Constance cited "extreme conflict" between Crowell and the parents and alleged that "it is impossible for either side to move forward in any case plan and court reports in this matter as there is no trust and no ability to work together." On May 17, the GAL and State filed a joint consent to the motions to remove Crowell from the case, as there was no longer a productive working relationship between Crowell and the parents.

On June 16, 2022, Constance filed a motion for in-home visitation, alleging that in-home parenting time had been suspended by the Department due to a police report involving the children finding drugs in the family home. Constance noted that no charges had been filed against her or Clinton, and that no further investigation had been conducted by the Department or law enforcement. On June 24, Constance filed a motion for parent visitation, seeking the restoration of her parenting time. Constance alleged that her visitation with the children had been ceased by the Department because the children's therapist recommended only therapeutic contact between Constance and the children.

Constance's motion for the restoration of her visitation was taken up at a permanency and review hearing held on June 30, 2022. The juvenile court ordered the Department to resume supervised visitation between Constance and the children and to prepare a safety plan pertaining to the supervised visits. The court suspended Clinton's parenting time with the children, pending a further order of the court. An order memorializing the court's visitation orders was entered on July 6.

The juvenile court addressed Constance's objection to the children's placement change and motion for in-home visitation in a supplemental order filed on July 8, 2022. The court denied the motion to change the children's placement, noting that there is a severe shortage of foster placements throughout the state and that the Department had looked for placements closer to the

family home without success. Additionally, the children's current placement was appropriate and serves their best interests.

Regarding Constance's motion for in-home visitation, the juvenile court recounted that in-home visits were suspended after allegations that Polly found methamphetamine at Clinton's house during a visit. Polly took the suspected methamphetamine back to her foster home. When Polly showed her foster mother the suspected methamphetamine, the foster mother contacted the foster care support worker, who later contacted law enforcement. Ultimately, the substance field-tested positive for methamphetamine.

The juvenile court found that it was appropriate to suspend in-home visits and that it was irrelevant whether there was an investigation into the incident by law enforcement. The court also noted that it was unclear where Constance was residing. However, if Constance were to obtain housing, it would be appropriate for visits with the children to occur in her home, subject to the court's order barring Clinton from those visits and a walk-through conducted by the Department.

On October 4, 2022, Constance filed a motion for a hair follicle test. The same day, the juvenile court granted the motion and ordered Constance to submit to a hair follicle test, to be administered and paid for by the Department.

## 2. TRIAL

The termination trial was held over the course of 2 days in October 2022. The following evidence was adduced.

### (a) Substance Use

Randi Golightly, the family's Department caseworker since May 2022, testified to the circumstances of Polly and Sawyer's removal. Law enforcement placed the children in emergency custody after Constance and Clinton were both arrested following a domestic violence incident. Following their removal, the children participated in a hair follicle test and both tested positive for methamphetamines and amphetamines.

Constance participated in several substance use evaluations throughout the case. The first was conducted at South Central Behavioral Services in April 2021, which recommended that Constance participate in intensive outpatient treatment consisting of 9 hours of group therapy and 1 hour of individual family therapy per week for a total of 8 weeks, attend a minimum of 8 Narcotics Anonymous (NA) meetings during the 8 weeks, and participate in peer support. Constance completed only 4 weeks of intensive outpatient treatment because she had to travel over 85 miles to Kearney, Nebraska from Burwell, Nebraska and was unable to afford the gas necessary for the trips and disliked spending the entire day away from home. Constance also did not attend any NA meetings as she was unable to find any meetings in the area. She conceded that she never asked her counselor about the availability of nearby NA meetings. Constance did attend peer support meetings every Friday for 8 weeks.

Constance brought her concerns regarding the traveling distance to attend intensive outpatient treatment to her counselor at South Central Behavioral Services, who updated her substance use evaluation in June 2021. The updated evaluation recommended 1 hour of individual counseling and continuing peer support. Constance attended individual counseling with that counselor until August 2021.

Constance's counselor at South Central Behavioral Services updated her substance use evaluation for a third time in August 2021. Constance did not participate in the evaluation and the evaluation was updated using collateral information provided by Crowell. The evaluation notes that Crowell informed the counselor of the circumstances of Constance's recent criminal charge in Buffalo County on August 4, including that Constance had methamphetamine and pipes in her purse at the time of a traffic stop and that a bag of synthetic urine was found in the back seat of the car by the arresting officer. Crowell also relayed that a sweat patch worn by Constance from August 23 to 30 tested positive for methamphetamine on September 9. This third evaluation recommended medium intensity residential treatment for Constance.

Constance testified that she had never been provided a copy of the August 2021 evaluation. However, during an evaluation in October 2022, discussed below, Constance stated that her counselor had "completed an assessment for her in August 2021 recommending she go to inpatient treatment."

Constance participated in another substance use evaluation at Midwest Country Clinic in December 2021. Because the previous evaluation had been updated for a third time without Constance's participation, she requested that the Department not be a part of the December 2021 evaluation. The recommendations of this evaluation were similar to those in her first evaluation: intensive outpatient treatment counseling with a counselor able to treat both her trauma and substance abuse, participation in twelve-step recovery meetings weekly for at least 12 months, and participation in weekly community support meetings, such as NA. Constance testified that she has been attending weekly counseling with a new, second counselor, Amber Keefe, since January 2022. Together they have worked on Constance's codependency and trauma issues and developing her coping skills. Though she is unopposed to attending community support or NA meetings, she has not done so yet because she "honestly kind of forgot about it."

Constance was most recently evaluated again at the Midwest Country Clinic in October 2022. Constance reported to the evaluator that she used methamphetamine recreationally in her mid-20s but escalated to using 3-4 times a week around age 30 and used methamphetamine daily by age 35. At trial Constance acknowledged that she had given birth to Polly when she was 29 years old and to Sawyer when she was 36.

The October 2022 evaluation notes that Constance had made little progress in the last 10 months and that she is in need of a residential treatment program with a traditional living program. The evaluation goes on to state that a "similar recommendation was made approximately a year ago, yet Connie did not go." The evaluation also recommended Constance's participation in trauma counseling, weekly twelve-step meetings, and a medication consultation. Because several residential programs are available throughout the state and because Constance is enrolled with Medicaid and can afford treatment through her insurance benefits, the evaluation noted the only potential barrier to this level of care is Constance's unwillingness to accept the recommendation.

Constance testified that that she was willing to attend residential treatment but was concerned about starting so shortly after she secured a new job and she wanted to continue making progress on the juvenile case. Constance claimed that this most recent evaluation was the first time she was aware that residential treatment was recommended.

Constance was offered a urinalysis (UA) through the Department over 60 times from April 2021 to October 2022. Of the 63 offered UAs, 41 samples were tested, and Constance refused to be tested 10 times between May 2021 and June 2022. The completed UAs all tested negative.

Constance was offered a sweat patch through the Department over 60 times from March 2021 to October 2022. However, Constance refused to have a sweat patch placed on her person 25 times between March 2021 and January 2022. Constance's sweat patches were tampered with or fell off 9 times between January and August 2022. The patches tested positive for amphetamine and methamphetamine 16 times between August 2021 and October 2022.

Golightly noted that Constance's latest positive sweat patch was tested on October 8, 2022. During a recent conversation Golightly had with Keefe, who has been counseling Constance on issues related to substance use, Keefe was unaware that Constance had been returning positive drug tests to the Department. Constance's hair follicle test, collected on October 18, 2022, was negative.

Constance testified that she has been sober since February 2022. Constance could not say why some of her sweat patches have returned positive results since that time.

Melissa Santana, one of Constance's family support workers, testified to the signs of tampering with a sweat patch drug test, which included peeling edges and the patch moving locations on the body. Santana estimated that only 1 percent of sweat patches fall off without previously being tampered with. She also noted that a sweat patch is a more accurate drug test. Additionally, a UA only tests for substances used within the last 72 hours, whereas a sweat patch is worn for 7-10 days and can reflect substances in the body throughout that period.

The lab reports entered into evidence for Constance's various drug tests list the quantitative test results for each type of test. The lab report from Constance's UA tests defines the testing threshold as "[t]he concentration level above which the presence of a drug or drug class in the sample will be reported as Presumptive Positive or Positive." For the amphetamines class, Constance's UA tests used a threshold of 1,000 nanograms per milliliter. The sweat patch tests used a threshold of 10 nanograms per milliliter, and the hair follicle test used a threshold of 500 picograms per milliliter.

Throughout the juvenile case, Constance has been arrested on substance related criminal charges. Constance was arrested on August 4, 2021, for attempted possession of a controlled substance in Buffalo County, and on December 9 for attempted possession of a controlled substance in Valley County. Constance pled to both charges and was serving terms of probation. Constance also had a pending trial in Valley County for possession of methamphetamine.

Constance has been on probation since June 2022. Martin Gonzalez, Constance's probation officer, testified that Constance was doing well on probation, attending monthly meetings with Gonzalez, participating in counseling, and finding employment. She was sanctioned once for missing a drug test in August but has otherwise complied with all her tests and has consistently tested negative. Constance has completed a relapse class and was currently taking a parenting class. Gonzalez believed that Constance was attending NA meetings.

Gonzalez had recently administered a sweat patch at Constance's request, which returned a positive result for methamphetamine the day before trial. Constance had reported to Gonzalez that she had tested positive for methamphetamine on her Department sweat patches, but negative

on her Department UAs, and wanted Gonzalez to place a sweat patch on her to explain the discrepancy.

Constance's attorney moved for a continuance citing the discrepancies between the positive sweat patches and negative UAs and hair follicle tests. He argued that the continuance would allow Constance to take a blood test or, in the alternative, obtain an expert witness who could testify to the differences between sweat patches and UAs.

The juvenile court overruled Constance's motion for a continuance, noting that discrepancies in UAs and sweat patches was not specific to the juvenile case. The court also observed that it had heard no evidence at trial explaining the discrepancies, although the discrepancies had existed throughout the life of the case. Relying on the court's own training and experience, it found Santana's testimony on the differences between drug tests to be inaccurate. The court went on the state,

> I'm not going to grant a continuance. Everybody had the same information before trial. Everybody had the same opportunities to request somebody to come in and do that. Whether or not I can make a decision, I don't know based on the drug tests as part of it. We may be to a point where I don't make a decision that relies on the drug tests because I don't have enough information, but I'm not going to delay the trial any longer.

## (b) Domestic Violence

Domestic violence had been an issue throughout Constance and Clinton's relationship. Constance described their dynamic as involving verbal abuse, mental abuse, shoving, and screaming, at times in the presence of the children. On March 4 and 5, 2022, Constance told a visitation worker that Clinton had punched her.

Constance also recalled a time when visitation with the children was delayed due to Clinton's domestic violence. During the juvenile case when Clinton and Constance were having joint visitation, an argument began shortly before parenting time was to occur at their home. Items were thrown and Clinton pushed Constance onto their bed. Constance called the family support worker to tell her not to bring the children to the home until Constance could gain control of the situation. Clinton eventually left the home and Constance was able to have the visit with the children.

Casey Hurlburt, Valley County Sheriff, testified to investigating a domestic violence incident between Clinton and Constance which occurred on September 21, 2022. Constance delayed in reporting the incident until September 23; she indicated that she did not want to get Clinton into trouble and was concerned about how the incident would affect the outcome of the juvenile case. Constance reported that on September 21, she had an appointment related to the juvenile case. Clinton was upset with Constance and told her to come to his home in Arcadia after the appointment and collect her belongings. When Constance arrived at Clinton's home, an altercation arose during which Clinton shoved and kicked toward Constance, causing her pain and swelling in her left eye. Hurlburt testified that Constance had a visible black eye and Clinton was arrested for third degree assault.

Constance filed a protection order petition and affidavit against Clinton the day after the incident and an ex parte domestic abuse protection order was issued on September 26 by the district

court. A hearing was held on the protection order, but Constance was unable to attend the hearing in Arcadia because she had to participate in a hair follicle test for the Department and works in Grand Island, Nebraska, over 65 miles away. As a result, the ex parte protection order was rescinded.

Constance noted that it was a condition of Clinton's bond to have no contact with Constance. Constance conceded that Clinton had been contacting her through phone calls and text messages and was relaying messages "full of ultimatums, and threats, and name calling, hostility towards me."

Constance testified that domestic violence has been an issue in other past relationships, including with the father of her other two children not involved in this juvenile case. Constance met with a domestic violence service, which helped her to file the protection order, but acknowledged that she has done nothing else to develop a safety plan for future domestic violence incidents. Constance explained that she was told by case professionals that if she had her parenting time separate from Clinton's, she would be given fewer hours with the children, and so she stayed with Clinton for a period to have visits together.

Constance recently filed for divorce from Clinton, describing the domestic violence incident, in addition to the juvenile court case, as a breaking point.

(c) Parenting Time

Supervised in-home parenting time was offered both individually and jointly to Constance and Clinton, until the spring of 2022 when there were allegations that Polly had found drugs in Clinton's home during a visit. Following the juvenile court's July 8 order, Constance was allowed individual supervised parenting time in the community. From our record is does not appear that Constance was at the visit when the drugs were allegedly found. Additionally, Constance testified that Polly has not attended parenting time with her since May 29, 2022. Constance has never progressed to unsupervised visits with the children.

Laura Vanderbeek supervised Constance's parenting time from February to September 2022. She described Constance as a "nurturing person" who was always attentive to the children. The visits would occur in the community of O'Neill, such as the library or park, and Constance would bring models for Sawyer to put together if the weather was bad. Constance's parenting had improved in terms of setting boundaries and consistently disciplining Sawyer. Vanderbeek had no concerns regarding Constance's visits with Sawyer and did not testify as to her opinion of Constance's visits with Polly before they stopped.

Tiffany Peed has supervised visits between Constance and Sawyer since August 2022. Polly has refused to attend visits. Peed observed a strong bond between Constance and Sawyer. The visits usually occur in a hotel in O'Neill, and Constance plans for activities and meals both inside and outside of the hotel. Sawyer enjoys visits with Constance and struggles when visitation comes to an end, kicking off his socks and shoes or running away to procrastinate having to leave Constance. Peed found all of Constance's interactions with Sawyer to be appropriate and believed that Constance would be able to manage unsupervised parenting time.

Peed referenced a few instances of the children's foster mother saying "derogatory things" to Peed about Constance, though at trial Peed did not specify what the comments were. The

children were not present at the time the comments were made and Peed reported the comments to her supervisor, who then informed Golightly.

### (d) Children's Therapeutic Needs

Polly's counselor, Gina Smith, testified that she has seen Polly since June 2021. Polly has symptoms of post-traumatic stress disorder and anxiety, including fearfulness, helplessness, expressions of guilt and low self-worth, self-blame, poor sleep, and difficulty trusting adults. Polly has expressed concerns of drug use and domestic violence that she witnessed while living in the home, and feelings of hurt and sadness in her relationships with her parents. Smith clarified that Polly had not seen her parents using drugs firsthand, but Polly had described their erratic behavior, inappropriate discussions, and her fear over their drug use.

Smith believed that Polly would benefit from a safe environment which would allow Polly to express herself openly without fear of punishment. Smith had begun working with Keefe on setting up therapeutic visits, but wanted to consult with Keefe and Polly before any therapeutic intervention occurred to ensure that it was safe and there were clear objectives for all participants.

Sawyer's counselor testified that she has seen Sawyer since February 2022. Sawyer's counselor sees him weekly to work on strategies and coping skills related to his post-traumatic stress disorder. The counselor noted that Sawyer enjoys his supervised visits with Constance and because there have been no reported concerns, she did not see a reason to stop those visits. Sawyer has asked his counselor general questions about living in foster care and expressed concern that he would never be able to see Constance again. His counselor recommended continued weekly counseling and child-parent psychotherapy in the event Sawyer is returned to Constance's care.

Constance testified that she is eager to begin family therapy with Polly. At the time of trial, Polly was not speaking to Constance for "things that went on in the house when she was still at home." Constance was "finally" given permission by the Department to contact Polly's counselor and since then has met with Smith and written a therapeutic letter to Polly with the help of Keefe. Constance was previously told by Crowell that she was not allowed to communicate with Polly's counselor.

Golightly had begun preparations for therapeutic visits, but they had not yet occurred. At the time of trial, Keefe and Smith were working together to create a therapeutic plan. Upon the juvenile court's questioning, Golightly clarified that the June 30 order resumed supervised visits between Constance and the children but made no reference to therapeutic visitation regarding Constance. Golightly noted that the Department had recommended therapeutic visits as a means of encouraging Polly to resume supervised visits with Constance.

### (e) Personality Conflicts

Constance testified that her relationship with Crowell was detrimental to her case progress. Due to personality conflicts between Crowell and Clinton, Constance felt that Crowell was sabotaging her case. Crowell would not respond to Constance's questions, would discuss the juvenile case with the children, and placed the children far from Constance in O'Neill. Constance found the last 5 months without Crowell as her caseworker to be moderately better. Karen testified that Crowell had pressured her into relinquishing placement of the children.

Golightly agreed that the relationship between Crowell and the parents was negative as Crowell had expressed his frustration to Golightly while transferring the juvenile case.

### (f) Overall Case Progress

Constance testified that when the case began in January 2021, she was residing in Clinton's home in Arcadia. In June 2021 Constance temporarily separated from Clinton due to personal disagreements and a lack of progress in the family's juvenile case and she moved to Burwell. Constance resided in Burwell until September 2021 when she was evicted for nonpayment of rent. After her eviction, Constance moved back into Clinton's home until January 2022, when Clinton's employer, who owned the home, asked Clinton to move out. Since January 2022, Constance has been homeless, staying in hotels, with various members of her family, and in Clinton's sleeper semi-truck. Constance has been making an effort to find housing, contacting several rental management companies, but has been met with a lack of available or affordable units.

To help Constance find housing, Golightly gave her the name of landlords who had potential housing open and offered to pay Constance's security deposit and first month's rent should she find housing, as is the Department's practice. Golightly was unaware of where Constance was residing for a portion of the case, which was unusual in her experience as a caseworker. Golightly testified that Constance would be permitted to resume in-home visitation with the children if she had housing and was consistently returning a negative result on her drug tests.

From July to September 2021, Constance worked at a grocery store in Arcadia, but lost the position when she was arrested on her first attempted possession charge. She was unemployed for over 1 year but had acquired an office support position in Grand Island shortly before trial. During her period of unemployment, Constance estimated that she had applied for over 100 jobs and received a few job offers, but the offers were rescinded after her background check was completed. While Constance was homeless and unemployed, she was financially supported by Clinton and borrowed money from her 18-year-old daughter.

Golightly testified that Constance has taken advantage of all services provided to her by the Department but has not been able to show stability. Golightly believes it is in the best interests of Polly and Sawyer to have Constance's parental rights terminated. The children had been out of the home for 21 months at the time of trial and though Constance made some progress on her case plan goals, her progress was still lacking. She does not have suitable housing, tested positive for methamphetamine on October 8, 2022, and the children were in need of stability.

### 3. ORDER

Following the termination trial, the juvenile court entered an order on December 1, 2022, terminating Constance's and Clinton's rights to Polly and Sawyer. The court found that the State and GAL had met the burden of proving grounds for termination under § 43-292(2), (4), (6), and (7) as to both Constance and Clinton. The court further found that Constance and Clinton were unfit parents and that it was in the best interests of the children to have their parental rights terminated.

Constance appeals.

## III. ASSIGNMENTS OF ERROR

Constance assigns, consolidated and restated, that the juvenile court erred in (1) overruling her motion to continue the termination trial; (2) finding that statutory grounds existed to support termination of her parental rights; and (3) finding that she is an unfit parent and that termination of her parental rights was in the children's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

## V. ANALYSIS

### 1. CONTINUANCE REQUEST

Constance first assigns that the juvenile court erred in failing to grant her oral motion to continue the termination trial. She argues that her constitutionally protected status as a parent entitles her to have the discrepancies in her drug tests explained by an expert witness. We disagree.

Whether to grant a continuance lies in the discretion of the court. *Weiss v. Weiss*, 260 Neb. 1015, 620 N.W.2d 744 (2001). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. Factors to consider include (1) the number of continuances granted to the moving party, (2) the importance of the issue presented in the matter, and (3) whether the continuance was being sought for a frivolous reason or dilatory motive. See *Id*.

Constance's motion to continue the trial was her first individual request for a continuance, although all parties made a joint motion to continue the permanency hearing and all pending motions for 3 months during the January 26, 2022, review hearing. The matter to be determined at the hearing, termination of parental rights, was clearly a matter of substantial gravity. However, Constance waited until the last day of trial to request the continuance, even though discrepancies in her drug tests had existed since her first positive sweat patch result in August 2021. Constance was well aware of the discrepancies between her drug test results prior to trial and had sufficient time to procure an expert witness who could explain the discrepancies.

We cannot say that the juvenile court abused its discretion in denying Constance's motion to continue; a continuance would have needlessly delayed trial. This assignment of error fails.

### 2. TERMINATION OF PARENTAL RIGHTS

#### (a) Statutory Grounds for Termination

The juvenile court found that the State and GAL had presented clear and convincing evidence to satisfy § 42-292(2), (4), (6), and (7). Constance contends that the juvenile court erred in finding that any statutory grounds existed to support termination of her parental rights.

Section 43-292(7) allows for termination when the juvenile has been in an out-of-home placement for 15 or more months of the most recent 22 months. It operates mechanically and,

unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Kenna S.*, 17 Neb. App. 544, 766 N.W.2d 424 (2009). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *Id*.

Constance argues that only the time after Crowell was removed from the case should be included in the § 43-292(7) calculation, as Crowell had sabotaged her case progression until his removal. Constance asserts the juvenile court erred in adopting "a strict timeline" and that doing so punished her for Crowell's failure to provide her with reasonable efforts. Brief for appellant at 31.

Polly and Sawyer have been in out-of-home placement for 15 or more of the most recent 22 months. The children were removed from the home on January 17, 2021. The State and GAL filed the motion for termination of parental rights on April 22, 2022, and the termination trial was held in October 2022. The children have remained out of the home since their removal in January 2021. While Constance argues that a "strict timeline" for § 43-292(7) should not have been used in this case, our precedent holds that § 43-292(7) operates mechanically. See *In re Interest of Kenna S., supra*. At the time of trial, the children had been out of the home for 21 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

Constance also argues that the juvenile court erred in finding statutory grounds under § 42-292(2), (4), and (6) existed to support the termination of her parental rights. However, if an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State and GAL presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Constance's parental rights exists.

(b) Parental Unfitness and Best Interests

Constance assigns that the juvenile court erred in finding that she was an unfit parent and that it was in the children's best interests to terminate her parental rights. In addition to proving a statutory ground, the State must show that termination of parental rights is in the best interests of the children. § 43-292; *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016). Because the parent's right to raise his or her children is constitutionally protected, the court may terminate parental rights only when the State shows that the parent is unfit. *In re Interest of Isabel P. et al., supra*. There is a rebuttable presumption that the best interests of the children are served by having a relationship with their parent. *Id*. This presumption is overcome only when the State has proved that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquires. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's

continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*.

Constance argues that she is a fit parent because she loves her children and shares a bond with them. Trial testimony evidenced the love Constance has for her children and that her supervised parenting time went well throughout the case, at least with respect to Sawyer. However, the Nebraska Supreme Court has held that having a bond with a child does not make the parent a fit person to provide parental care for the child. See *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016). Rather, the evidence adduced at the termination trial demonstrates that Constance is unable to provide her children with the level of parental care they require because she has not sufficiently managed her drug addiction.

Constance's addiction to methamphetamine has affected all aspects of her life. During her most recent substance use evaluation in October 2022, she reported that she had escalated to using methamphetamine every other day at the time of Polly's birth, and daily at the time of Sawyer's. Polly's and Sawyer's hair follicle tests were positive at the time of their removal. Constance has been arrested three times for drug-related charges during the pendency of this juvenile case. These arrests resulted in the loss of her job from the grocery store and have prevented her from acquiring a new job for over 1 year, as employers would rescind their offers of employment after completing a background check on Constance. While Constance was unemployed, she had to rely on Clinton, with whom she has a tumultuous and violent relationship, and her teenage daughter for financial support.

Even though Constance's addiction has trapped her in a cycle of poverty and domestic violence, she appears in denial over the severity of her addiction. At trial, Constance testified that she has been sober since February 2022. However, sweat patches placed by both the Department and her probation officer have returned positive results since that time. While Constance points to her negative UAs as a sign of her sobriety, on the face of the drug test lab reports entered into evidence, we observe that a sweat patch test will yield a positive result for methamphetamine or amphetamine at a lower concentration than a UA test. The juvenile court noted in its termination order that it takes significantly more methamphetamine to return a positive result on a UA than it does from a sweat patch, based on the required threshold for each type of test. Thus, we find Constance's positive sweat patches, as recent as October 2022, to be evidence of her continued methamphetamine use.

It also appears that Constance has not been honest about her addiction or treatment with case professionals. Her probation officer indicated that Constance was attending NA meetings, however, Constance testified that she had never attended a NA meeting because she was unable to find any in her area and had forgotten about that specific recommendation. Golightly testified that Keefe, whom Constance sees for substance abuse counseling, was unaware that Constance was testing positive on her sweat patches.

Constance has not taken steps to receive meaningful treatment. Constance's substance use evaluations twice recommended that she attend residential treatment program, first in August 2021 and again in October 2022. While Constance testified that she did not participate in the August 2021 evaluation and was not aware of the recommendations, in the juvenile court's termination order, the court found Constance's testimony on the matter was not credible. Given that the October 2022 substance use evaluation made reference to Constance knowing that the August

- 13 -

2021 evaluation recommended inpatient treatment and our deference to the juvenile court regarding the credibility of witnesses, it appears that Constance knew of the residential treatment recommendation in August 2021 and chose not to participate in that course of treatment. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). At trial Constance expressed hesitancy about participating in a residential treatment program because she wanted to continue making progress in the juvenile case. We are concerned that Constance does not see participating in residential treatment as making progress in her juvenile case.

We recognize that Constance has made recent efforts to improve her situation, including obtaining employment and pursuing a dissolution of her marriage to Clinton. However, at the time of trial she was still homeless and somewhat reliant upon Clinton. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020).

We acknowledge that Constance faced challenges in the juvenile case, including relational difficulties with her first caseworker and having to travel significant distances for parenting time with her children. Nevertheless, there has been minimal change in Constance's behavior over the course of the case, and based on Constance's lack of insight regarding her continued drug use or need to participate in residential treatment, she is unlikely to change in the future. The case plan goals have remained consistent throughout the case and have not been met. Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Polly and Sawyer have been in foster care since January 2021. They deserve stability in their lives and should not be suspended in foster care when Constance is unable to rehabilitate herself. Accordingly, we find there was clear and convincing evidence to show that Constance was unfit and that terminating her parental rights was in the children's best interests.

## VI. CONCLUSION

Upon our de novo review of the record, we affirm the order of the juvenile court terminating Constance's parental rights to Polly and Sawyer.

AFFIRMED.